(Slip Opinion)      OCTOBER  TERM,  2007                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CRAWFORD ET AL. *v.* MARION COUNTY ELECTION BOARD ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 07–21.   Argued January 9, 2008—Decided April 28, 2008*

After Indiana enacted an election law (SEA 483) requiring citizens vot-
ing in person to present government-issued photo identification, peti-
tioners filed separate suits challenging the law's constitutionality.
Following discovery, the District Court granted respondents sum-
mary judgment, finding the evidence in the record insufficient to
support a facial attack on the statute's validity.  In affirming, the
Seventh Circuit declined to judge the law by the strict standard set
for poll taxes in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663,
finding the burden on voters offset by the benefit of reducing the risk
of fraud.

*Held:* The judgment is affirmed.

472 F. 3d 949, affirmed.

    JUSTICE STEVENS, joined by THE CHIEF JUSTICE and JUSTICE KEN-
NEDY, concluded that the evidence in the record does not support a fa-
cial attack on SEA 483's validity.  Pp. 5–20.

    (a) Under *Harper,* even rational restrictions on the right to vote are
invidious if they are unrelated to voter qualifications.  However,
"even handed restrictions" protecting the "integrity and reliability of
the electoral process itself" satisfy *Harper*'s standard.  *Anderson* v.
*Celebrezze*, 460 U. S. 780, 788, n. 9.  A state law's burden on a politi-
cal party, an individual voter, or a discrete class of voters must be
justified by relevant and legitimate state interests "sufficiently
weighty to justify the limitation."  *Norman* v. *Reed*, 502 U. S. 279,

——————

    *Together with No. 07–25, *Indiana Democratic Party et al.* v. *Rokita,
Secretary of State of Indiana, et al.,* also on certiorari to the same court.

288–289.  Pp. 5–7.

(b) Each of Indiana's asserted interests is unquestionably relevant to its interest in protecting the integrity and reliability of the electoral process.  The first is the interest in deterring and detecting voter fraud.  Indiana has a valid interest in participating in a nationwide effort to improve and modernize election procedures criticized as antiquated and inefficient.  Indiana also claims a particular interest in preventing voter fraud in response to the problem of voter registration rolls with a large number of names of persons who are either deceased or no longer live in Indiana.  While the record contains no evidence that the fraud SEA 483 addresses—in-person voter impersonation at polling places—has actually occurred in Indiana, such fraud has occurred in other parts of the country, and Indiana's own experience with voter fraud in a 2003 mayoral primary demonstrates a real risk that voter fraud could affect a close election's outcome.  There is no question about the legitimacy or importance of a State's interest in counting only eligible voters' votes.  Finally, Indiana's interest in protecting public confidence in elections, while closely related to its interest in preventing voter fraud, has independent significance, because such confidence encourages citizen participation in the democratic process.  Pp. 7–13.

(c) The relevant burdens here are those imposed on eligible voters who lack photo identification cards that comply with SEA 483.  Because Indiana's cards are free, the inconvenience of going to the Bureau of Motor Vehicles, gathering required documents, and posing for a photograph does not qualify as a substantial burden on most voters' right to vote, or represent a significant increase over the usual burdens of voting.  The severity of the somewhat heavier burden that may be placed on a limited number of persons—*e.g.,* elderly persons born out-of-state, who may have difficulty obtaining a birth certificate—is mitigated by the fact that eligible voters without photo identification may cast provisional ballots that will be counted if they execute the required affidavit at the circuit court clerk's office.  Even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish petitioners' right to the relief they seek.  Pp. 13–16.

(d) Petitioners bear a heavy burden of persuasion in seeking to invalidate SEA 483 in all its applications.  This Court's reasoning in *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. ___, applies with added force here.  Petitioners argue that Indiana's interests do not justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office, but it is not possible to quantify, based on the evidence in the record, either that burden's magnitude

or the portion of the burden that is fully justified.  A facial challenge
must fail where the statute has a "'plainly legitimate sweep.'" *Id.*, at
___.  When considering SEA 483's broad application to all Indiana
voters, it "imposes only a limited burden on voters' rights." *Burdick*
v. *Takushi*, 504 U. S. 428, 439.  The "precise interests" advanced by
Indiana are therefore sufficient to defeat petitioners' facial challenge.
*Id.*, at 434.  Pp. 16–20.

(e) Valid neutral justifications for a nondiscriminatory law, such as
SEA 483, should not be disregarded simply because partisan inter-
ests may have provided one motivation for the votes of individual leg-
islators.  P. 20.

JUSTICE SCALIA, joined by JUSTICE THOMAS and JUSTICE ALITO, was
of the view that petitioners' premise that the voter-identification law
might have imposed a special burden on some voters is irrelevant.
The law should be upheld because its overall burden is minimal and
justified.  A law respecting the right to vote should be evaluated un-
der the approach in *Burdick* v. *Takushi*, 504 U. S. 428, which calls for
application of a deferential, "important regulatory interests" stan-
dard for nonsevere, nondiscriminatory restrictions, reserving strict
scrutiny for laws that severely restrict the right to vote, *id.,* at 433–
434.  The different ways in which Indiana's law affects different vot-
ers are no more than different impacts of the single burden that the
law uniformly imposes on all voters: To vote in person, everyone must
have and present a photo identification that can be obtained for free.
This is a generally applicable, nondiscriminatory voting regulation.
The law's universally applicable requirements are eminently reason-
able because the burden of acquiring, possessing, and showing a free
photo identification is not a significant increase over the usual voting
burdens, and the State's stated interests are sufficient to sustain that
minimal burden.  Pp. 1–6.

STEVENS, J., announced the judgment of the Court and delivered an
opinion, in which ROBERTS, C. J., and KENNEDY, J., joined.  SCALIA, J.,
filed an opinion concurring in the judgment, in which THOMAS and
ALITO, JJ., joined.  SOUTER, J., filed a dissenting opinion, in which
GINSBURG, J., joined.  BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

——————

Nos. 07–21 and 07–25

——————

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                    *v.*
MARION COUNTY ELECTION BOARD ET AL.


INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                    *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and JUSTICE KENNEDY join.

At issue in these cases is the constitutionality of an Indiana statute requiring citizens voting in person on election day, or casting a ballot in person at the office of the circuit court clerk prior to election day, to present photo identification issued by the government.

Referred to as either the "Voter ID Law" or "SEA 483,"[1] the statute applies to in-person voting at both primary and general elections. The requirement does not apply to absentee ballots submitted by mail, and the statute contains an exception for persons living and voting in a state-

——————

[1] Senate Enrolled Act No. 483, 2005 Ind. Acts p. 2005.

licensed facility such as a nursing home. Ind. Code Ann. §3–11–8–25.1(e) (West Supp. 2007). A voter who is indigent or has a religious objection to being photographed may cast a provisional ballot that will be counted only if she executes an appropriate affidavit before the circuit court clerk within 10 days following the election. §§3–11.7–5–1, 3–11.7–5–2.5(c) (West 2006).[2] A voter who has photo identification but is unable to present that identification on election day may file a provisional ballot that will be counted if she brings her photo identification to the circuit county clerk's office within 10 days. §3–11.7–5–2.5(b). No photo identification is required in order to register to vote,[3] and the State offers free photo identification to qualified voters able to establish their residence and identity. §9–24–16–10(b) (West Supp. 2007).[4]

Promptly after the enactment of SEA 483 in 2005, the Indiana Democratic Party and the Marion County Democratic Central Committee (Democrats) filed suit in the Federal District Court for the Southern District of Indiana against the state officials responsible for its enforcement, seeking a judgment declaring the Voter ID Law invalid

——————

[2] The affidavit must state that (1) the person executing the affidavit is the same individual who cast the provisional ballot on election day; and (2) the affiant is indigent and unable to obtain proof of identification without paying a fee or has a religious objection to being photographed. Ind. Code Ann. §3–11–7.5–2.5(c) (West 2006). If the election board determines that the challenge to the affiant was based solely on a failure to present photo identification, the "county election board shall . . . find that the voter's provisional ballot is valid." §3–11–7.5–2.5(d).

[3] Voters registering to vote for the first time in Indiana must abide by the requirements of the Help America Vote Act of 2002 (HAVA), 116 Stat. 1666, described *infra,* at 8–9.

[4] Indiana previously imposed a fee on all residents seeking a state-issued photo identification. At the same time that the Indiana Legislature enacted SEA 483, it also directed the Bureau of Motor Vehicles (BMV) to remove all fees for state-issued photo identification for individuals without a driver's license who are at least 18 years old. See 2005 Ind. Acts p. 2017, §18.

and enjoining its enforcement. A second suit seeking the same relief was brought on behalf of two elected officials and several nonprofit organizations representing groups of elderly, disabled, poor, and minority voters.[5] The cases were consolidated, and the State of Indiana intervened to defend the validity of the statute.

The complaints in the consolidated cases allege that the new law substantially burdens the right to vote in violation of the Fourteenth Amendment; that it is neither a necessary nor appropriate method of avoiding election fraud; and that it will arbitrarily disfranchise qualified voters who do not possess the required identification and will place an unjustified burden on those who cannot readily obtain such identification. Second Amended Complaint in No. 1: 05–CV–0634–SEB–VSS (SD Ind.), pp. 6–9 (hereinafter Second Amended Complaint).

After discovery, District Judge Barker prepared a comprehensive 70-page opinion explaining her decision to grant defendants' motion for summary judgment. 458 F. Supp. 2d 775 (SD Ind. 2006). She found that petitioners had "not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of SEA 483 or who will have his or her right to vote unduly burdened by its requirements." *Id.*, at 783. She rejected "as utterly incredible and unreliable" an expert's report that up to 989,000 registered voters in Indiana did not possess either a driver's license or other acceptable photo identification. *Id.,* at 803. She estimated that as of 2005, when the statute was enacted, around 43,000 Indiana

—————

[5] Specifically, the plaintiffs were William Crawford, Joseph Simpson, Concerned Clergy of Indianapolis, Indianapolis Resource Center for Independent Living, Indiana Coalition on Housing and Homeless Issues, Indianapolis Branch of the National Association for the Advancement of Colored People, and United Senior Action of Indiana. Complaint in No. 49012050 4PL01 6207 (Super. Ct. Marion Cty., Ind., Apr. 28, 2005), p. 2.

residents lacked a state-issued driver's license or identification card. *Id.,* at 807.[6]

A divided panel of the Court of Appeals affirmed. 472 F. 3d 949 (CA7 2007). The majority first held that the Democrats had standing to bring a facial challenge to the constitutionality of SEA 483. Next, noting the absence of any plaintiffs who claimed that the law would deter them from voting, the Court of Appeals inferred that "the motivation for the suit is simply that the law may require the Democratic Party and the other organizational plaintiffs to work harder to get every last one of their supporters to the polls." *Id.,* at 952. It rejected the argument that the law should be judged by the same strict standard applicable to a poll tax because the burden on voters was offset by the benefit of reducing the risk of fraud. The dissenting judge, viewing the justification for the law as "hollow"—more precisely as "a not-too-thinly-veiled attempt to discourage election-day turnout by certain folks believed to skew Democratic"—would have applied a stricter standard, something he described as "close to 'strict scrutiny light.'" *Id.,* at 954, 956 (opinion of Evans, J.). In his view, the "law imposes an undue burden on a recognizable segment of potential eligible voters" and therefore violates their rights under the First and Fourteenth Amendments to the Constitution. *Id.,* at 956–957.

Four judges voted to grant a petition for rehearing en banc. 484 F. 3d 437 (CA7 2007) (Wood, J., dissenting from denial of rehearing en banc). Because we agreed with their assessment of the importance of these cases, we

_____

[6] She added: "In other words, an estimated 99% of Indiana's voting age population already possesses the necessary photo identification to vote under the requirements of SEA 483." 458 F. Supp. 2d, at 807. Given the availability of free photo identification and greater public awareness of the new statutory requirement, presumably that percentage has increased since SEA 483 was enacted and will continue to increase in the future.

granted certiorari. 551 U. S. \_\_\_ (2007). We are, however, persuaded that the District Court and the Court of Appeals correctly concluded that the evidence in the record is not sufficient to support a facial attack on the validity of the entire statute, and thus affirm.[7]

I

In *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966), the Court held that Virginia could not condition the right to vote in a state election on the payment of a poll tax of $1.50. We rejected the dissenters' argument that the interest in promoting civic responsibility by weeding out those voters who did not care enough about public affairs to pay a small sum for the privilege of voting provided a rational basis for the tax. See *id.,* at 685 (opinion of Harlan, J.). Applying a stricter standard, we concluded that a State "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Id.*, at 666 (opinion of the Court). We used the term "invidiously discriminate" to describe conduct prohibited under that standard, noting that we had previously held that while a State may obviously impose "reasonable residence restrictions on the availability of the ballot," it "may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services." *Id.,* at 666–667 (citing *Carrington* v. *Rash*, 380 U. S. 89, 96 (1965)). Although the State's justification for the tax was rational, it was invidious because it was irrelevant to the voter's qualifications.

Thus, under the standard applied in *Harper,* even rational restrictions on the right to vote are invidious if they

_____

[7] We also agree with the unanimous view of those judges that the Democrats have standing to challenge the validity of SEA 483 and that there is no need to decide whether the other petitioners also have standing.

are unrelated to voter qualifications. In *Anderson* v. *Celebrezze,* 460 U. S. 780 (1983), however, we confirmed the general rule that "evenhanded restrictions that protect the integrity and reliability of the electoral process itself" are not invidious and satisfy the standard set forth in *Harper.* 460 U. S., at 788, n. 9. Rather than applying any "litmus test" that would neatly separate valid from invalid restrictions, we concluded that a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the "hard judgment" that our adversary system demands.

In later election cases we have followed *Anderson*'s balancing approach. Thus, in *Norman* v. *Reed,* 502 U. S. 279, 288–289 (1992), after identifying the burden Illinois imposed on a political party's access to the ballot, we "called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation," and concluded that the "severe restriction" was not justified by a narrowly drawn state interest of compelling importance. Later, in *Burdick* v. *Takushi*, 504 U. S. 428 (1992), we applied *Anderson*'s standard for "'reasonable, nondiscriminatory restrictions,'" 504 U. S., at 434, and upheld Hawaii's prohibition on write-in voting despite the fact that it prevented a significant number of "voters from participating in Hawaii elections in a meaningful manner." *Id.,* at 443 (KENNEDY, J., dissenting). We reaffirmed *Anderson*'s requirement that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the "'precise interests put forward by the State as justifications for the burden imposed by its rule.'" 504 U. S., at 434 (quoting *Anderson*, 460 U. S., at 789).[8]

---

[8] Contrary to JUSTICE SCALIA's suggestion, see *post,* at 2 (opinion concurring in judgment), our approach remains faithful to *Anderson* and *Burdick.* The *Burdick* opinion was explicit in its endorsement and

In neither *Norman* nor *Burdick* did we identify any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear, as *Harper* demonstrates, it must be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation." *Norman,* 502 U. S., at 288–289. We therefore begin our analysis of the constitutionality of Indiana's statute by focusing on those interests.

## II

The State has identified several state interests that arguably justify the burdens that SEA 483 imposes on voters and potential voters. While petitioners argue that the statute was actually motivated by partisan concerns and dispute both the significance of the State's interests and the magnitude of any real threat to those interests, they do not question the legitimacy of the interests the State has identified. Each is unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process.

The first is the interest in deterring and detecting voter fraud. The State has a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient.[9] The State also argues that it has a particular

―――――――――

adherence to *Anderson*, see 504 U. S., at 434, and repeatedly cited *Anderson*, see 504 U. S., at 436, n. 5, 440, n. 9, 441. To be sure, *Burdick* rejected the argument that strict scrutiny applies to all laws imposing a burden on the right to vote; but in its place, the Court applied the "'flexible standard'" set forth in *Anderson*. *Burdick* surely did not create a novel "deferential 'important regulatory interests' standard." See *post,* at 1–2.

[9] See National Commission on Federal Election Reform, To Assure Pride and Confidence in the Electoral Process 18 (2002) (with Honorary Co-chairs former Presidents Gerald Ford and Jimmy Carter).

interest in preventing voter fraud in response to a problem
that is in part the product of its own maladministration—
namely, that Indiana's voter registration rolls include a
large number of names of persons who are either deceased
or no longer live in Indiana. Finally, the State relies on its
interest in safeguarding voter confidence. Each of these
interests merits separate comment.

*Election Modernization*

Two recently enacted federal statutes have made it
necessary for States to reexamine their election proce-
dures. Both contain provisions consistent with a State's
choice to use government-issued photo identification as a
relevant source of information concerning a citizen's eligi-
bility to vote.

In the National Voter Registration Act of 1993 (NVRA),
107 Stat. 77, 42 U. S. C. §1973gg *et seq.,* Congress estab-
lished procedures that would both increase the number of
registered voters and protect the integrity of the electoral
process. §1973gg. The statute requires state motor vehi-
cle driver's license applications to serve as voter registra-
tion applications. §1973gg–3. While that requirement has
increased the number of registered voters, the statute also
contains a provision restricting States' ability to remove
names from the lists of registered voters. §1973gg–6(a)(3).
These protections have been partly responsible for inflated
lists of registered voters. For example, evidence credited
by Judge Barker estimated that as of 2004 Indiana's voter
rolls were inflated by as much as 41.4%, see 458 F. Supp.
2d, at 793, and data collected by the Election Assistance
Committee in 2004 indicated that 19 of 92 Indiana coun-
ties had registration totals exceeding 100% of the 2004
voting-age population, Dept. of Justice Complaint in
*United States* v. *Indiana,* No. 1:06–cv–1000–RLY–TAB
(SD Ind., June 27, 2006), p. 4, App. 313.

In HAVA, Congress required every State to create and

maintain a computerized statewide list of all registered voters. 42 U. S. C. §15483(a) (2000 ed., Supp. V). HAVA also requires the States to verify voter information contained in a voter registration application and specifies either an "applicant's driver's license number" or "the last 4 digits of the applicant's social security number" as acceptable verifications. §15483(a)(5)(A)(i). If an individual has neither number, the State is required to assign the applicant a voter identification number. §15483(a)(5)(A)(ii).

HAVA also imposes new identification requirements for individuals registering to vote for the first time who submit their applications by mail. If the voter is casting his ballot in person, he must present local election officials with written identification, which may be either "a current and valid photo identification" or another form of documentation such as a bank statement or paycheck. §15483(b)(2)(A). If the voter is voting by mail, he must include a copy of the identification with his ballot. A voter may also include a copy of the documentation with his application or provide his driver's license number or Social Security number for verification. §15483(b)(3). Finally, in a provision entitled "Fail-safe voting," HAVA authorizes the casting of provisional ballots by challenged voters. §15483(b)(2)(B).

Of course, neither HAVA nor NVRA required Indiana to enact SEA 483, but they do indicate that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology. That conclusion is also supported by a report issued shortly after the enactment of SEA 483 by the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which is a part of the record in these cases. In the introduction to their discussion of voter

identification, they made these pertinent comments:

> "A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed.
>
> "There is no evidence of extensive fraud in U. S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo identification cards currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." Commission on Federal Election Reform, Report, Building Confidence in U. S. Elections §2.5 (Sept. 2005), App. 136–137 (Carter-Baker Report) (footnote omitted).[10]

———————

[10] The historical perceptions of the Carter-Baker Report can largely be confirmed. The average precinct size in the United States has increased in the last century, suggesting that it is less likely that poll workers will be personally acquainted with voters. For example, at the time Joseph Harris wrote his groundbreaking 1934 report on election administration, Indiana restricted the number of voters in each precinct to 250. J. Harris, Election Administration in the United States 208 (Brookings Institution 1934). An Election Commission report indicates that Indiana's average number of registered voters per polling place is currently 1,014. Election Assistance Commission, Final Report of the 2004 Election Day Survey, ch. 13 (Sept. 2005) (Table 13) (hereinafter Final Report)

*Voter Fraud*

The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history. Moreover, petitioners argue that provisions of the Indiana Criminal Code punishing such conduct as a felony provide adequate protection against the risk that such conduct will occur in the future. It remains true, however, that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists,[11] that occasional examples have surfaced in recent years,[12] and that Indiana's own experi-

––––––––––

(prepared by Election Data Services, Inc.), online at http://www.eac.gov/clearinghouse/clearinghouse/2004-election-day-survey (all Internet materials as visited Apr. 16, 2008, and available in Clerk of Court's case file). In 1930, the major cities that Harris surveyed had an average number of voters per precinct that ranged from 247 to 617. Election Administration in the United States, at 214. While States vary today, most have averages exceeding 1,000, with at least eight States exceeding 2,000 registered voters per polling place. Final Report, ch. 13 (Table 13).

[11] Infamous examples abound in the New York City elections of the late nineteenth century, conducted under the influence of the Tammany Hall political machine. "Big Tim" Sullivan, a New York state senator, and—briefly—a United States Congressman, insisted that his "repeaters" (individuals paid to vote multiple times) have whiskers:

"'When you've voted 'em with their whiskers on you take 'em to a barber and scrape off the chin-fringe. Then you vote 'em again with side lilacs and a moustache. Then to a barber again, off comes the sides and you vote 'em a third time with the moustache. If that ain't enough and the box can stand a few more ballots clean off the moustache and vote 'em plain face. That makes every one of 'em good for four votes.'" M. Werner, Tammany Hall 439 (1928).

[12] Judge Barker cited record evidence containing examples from California, Washington, Maryland, Wisconsin, Georgia, Illinois, Pennsylvania, Missouri, Miami, and St. Louis. The Brief of *Amici Curiae* Brennan Center for Justice et al. in Support of Petitioners addresses

ence with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor[13]—though perpetrated using absentee ballots and not in-person fraud—demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.

There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

In its brief, the State argues that the inflation of its voter rolls provides further support for its enactment of SEA 483. The record contains a November 5, 2000, newspaper article asserting that as a result of NVRA and

––––––––––

each of these examples of fraud. While the brief indicates that the record evidence of in-person fraud was overstated because much of the fraud was actually absentee ballot fraud or voter registration fraud, there remain scattered instances of in-person voter fraud. For example, after a hotly contested gubernatorial election in 2004, Washington conducted an investigation of voter fraud and uncovered 19 "ghost voters." *Borders* v. *King Cty.,* No. 05–2–00027–3 (Super. Ct. Chelan Cty., Wash., June 6, 2005) (verbatim report of unpublished oral decision), 4 Election L. J. 418, 423 (2005). After a partial investigation of the ghost voting, one voter was confirmed to have committed in-person voting fraud. Le & Nicolosi, Dead Voted in Governor's Race, Seattle Post-Intelligencer, Jan. 7, 2005, p. A1.

[13] See *Pabey* v. *Pastrick,* 816 N. E. 2d 1138, 1151 (Ind. 2006) (holding that a special election was required because one candidate engaged in "a deliberate series of actions . . . making it impossible to determine the candidate who received the highest number of legal votes cast in the election"). According to the uncontested factual findings of the trial court, one of the candidates paid supporters to stand near polling places and encourage voters—especially those who were poor, infirm, or spoke little English—to vote absentee. The supporters asked the voters to contact them when they received their ballots; the supporters then "assisted" the voter in filling out the ballot.

"sloppy record keeping," Indiana's lists of registered voters included the names of thousands of persons who had either moved, died, or were not eligible to vote because they had been convicted of felonies.[14]  The conclusion that Indiana has an unusually inflated list of registered voters is supported by the entry of a consent decree in litigation brought by the Federal Government alleging violations of NVRA.  Consent Decree and Order in *United States* v. *Indiana*, No. 1:06–cv–1000–RLY–TAB (SD Ind., June 27, 2006), App. 299–307.  Even though Indiana's own negligence may have contributed to the serious inflation of its registration lists when SEA 483 was enacted, the fact of inflated voter rolls does provide a neutral and nondiscriminatory reason supporting the State's decision to require photo identification.

*Safeguarding Voter Confidence*

Finally, the State contends that it has an interest in protecting public confidence "in the integrity and legitimacy of representative government."  Brief for State Respondents, No. 07-25, p. 53.  While that interest is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.  As the Carter-Baker Report observed, the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."  *Supra,* at 10.

### III

States employ different methods of identifying eligible voters at the polls.  Some merely check off the names of registered voters who identify themselves; others require

---

[14] Theobald, Bogus Names Jam Indiana's Voter List, Indianapolis Star, Nov. 5, 2000, App. 145.

voters to present registration cards or other documenta-
tion before they can vote; some require voters to sign their
names so their signatures can be compared with those on
file; and in recent years an increasing number of States
have relied primarily on photo identification.[15]  A photo
identification requirement imposes some burdens on
voters that other methods of identification do not share.
For example, a voter may lose his photo identification,
may have his wallet stolen on the way to the polls, or may
not resemble the photo in the identification because he
recently grew a beard.  Burdens of that sort arising from
life's vagaries, however, are neither so serious nor so
frequent as to raise any question about the constitutional-
ity of SEA 483; the availability of the right to cast a provi-
sional ballot provides an adequate remedy for problems of
that character.

The burdens that are relevant to the issue before us are
those imposed on persons who are eligible to vote but do
not possess a current photo identification that complies
with the requirements of SEA 483.[16]  The fact that most
voters already possess a valid driver's license, or some
other form of acceptable identification, would not save the
statute under our reasoning in *Harper,* if the State re-

_____

[15] For a survey of state practice, see Brief for Texas et al. as *Amici
Curiae* 10–14, and nn. 1–23.

[16] Ind. Code Ann. §3–5–2–40.5 (West 2006) requires that the docu-
ment satisfy the following:

"(1) The document shows the name of the individual to whom the
document was issued, and the name conforms to the name in the
individual's voter registration record.

"(2) The document shows a photograph of the individual to whom the
document was issued.

"(3) The document includes an expiration date, and the document:

   "(A)  is not expired; or

   "(B)  expired after the date of the most recent general election.

"(4) The document was issued by the United States or the state of
Indiana."

quired voters to pay a tax or a fee to obtain a new photo identification. But just as other States provide free voter registration cards, the photo identification cards issued by Indiana's BMV are also free. For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.[17]

Both evidence in the record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons. They include elderly persons born out-of-state, who may have difficulty obtaining a birth certificate;[18] persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests,

_____

[17] To obtain a photo identification card a person must present at least one "primary" document, which can be a birth certificate, certificate of naturalization, U. S. veterans photo identification, U. S. military photo identification, or a U. S. passport. Ind. Admin. Code, tit. 140, §7–4–3 (2008). Indiana, like most States, charges a fee for obtaining a copy of one's birth certificate. This fee varies by county and is currently between $3 and $12. See Indiana State Department of Health Web page, http://www.in.gov/isdh/bdcertifs/lhdfees/toc.htm. Some States charge substantially more. Affidavit of Robert Andrew Ford, App. 12.

[18] As petitioners note, Brief for Petitioners in No. 07–21, p. 17, n. 7, and the State's "Frequently Asked Questions" Web page states, it appears that elderly persons who can attest that they were never issued a birth certificate may present other forms of identification as their primary document to the Indiana BMV, including Medicaid/Medicare cards and Social Security benefits statements. http://www.in.gov/faqs.htm; see also Ind. Admin. Code, tit. 140, §7–4–3 ("The commissioner or the commissioner's designee may accept reasonable alternate documents to satisfy the requirements of this rule").

that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote.

The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted. To do so, however, they must travel to the circuit court clerk's office within 10 days to execute the required affidavit. It is unlikely that such a requirement would pose a constitutional problem unless it is wholly unjustified. And even assuming that the burden may not be justified as to a few voters,[19] that conclusion is by no means sufficient to establish petitioners' right to the relief they seek in this litigation.

IV

Given the fact that petitioners have advanced a broad attack on the constitutionality of SEA 483, seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion. Only a few weeks ago we held that the Court of Appeals for the Ninth Circuit had failed to give appropriate weight to the magnitude of that burden when it sustained a preelection, facial attack on a Washington statute regulating that State's primary election procedures. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. ___ (2008). Our reasoning in that case applies with added force to the arguments advanced by petitioners in these cases.

_____

[19] Presumably most voters casting provisional ballots will be able to obtain photo identifications before the next election. It is, however, difficult to understand why the State should require voters with a faith-based objection to being photographed to cast provisional ballots subject to later verification in every election when the BMV is able to issue these citizens special licenses that enable them to drive without any photo identification. See Ind. Code Ann. 9–24–11–5(c) (West Supp. 2007).

Petitioners ask this Court, in effect, to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity. Petitioners urge us to ask whether the State's interests justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting. But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.

First, the evidence in the record does not provide us with the number of registered voters without photo identification; Judge Barker found petitioners' expert's report to be "utterly incredible and unreliable." 458 F. Supp. 2d, at 803. Much of the argument about the numbers of such voters comes from extrarecord, postjudgment studies, the accuracy of which has not been tested in the trial court.

Further, the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification. The record includes depositions of two case managers at a day shelter for homeless persons and the depositions of members of the plaintiff organizations, none of whom expressed a personal inability to vote under SEA 483. A deposition from a named plaintiff describes the difficulty the elderly woman had in obtaining an identification card, although her testimony indicated that she intended to return to the BMV since she had recently obtained her birth certificate and that she was able to pay the birth certificate fee. App. 94.

Judge Barker's opinion makes reference to six other elderly named plaintiffs who do not have photo identifications, but several of these individuals have birth certifi-

cates or were born in Indiana and have not indicated how difficult it would be for them to obtain a birth certificate. 458 F. Supp. 2d, at 797–799.  One elderly named plaintiff stated that she had attempted to obtain a birth certificate from Tennessee, but had not been successful, and another testified that he did not know how to obtain a birth certificate from North Carolina.  The elderly in Indiana, however, may have an easier time obtaining a photo identification card than the nonelderly, see n. 17, *supra,* and although it may not be a completely acceptable alternative, the elderly in Indiana are able to vote absentee without presenting photo identification.

The record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed.  While one elderly man stated that he did not have the money to pay for a birth certificate, when asked if he did not have the money or did not wish to spend it, he replied, "both."  App. 211–212.  From this limited evidence we do not know the magnitude of the impact SEA 483 will have on indigent voters in Indiana.  The record does contain the affidavit of one homeless woman who has a copy of her birth certificate, but was denied a photo identification card because she did not have an address.  *Id.,* at 67.  But that single affidavit gives no indication of how common the problem is.

In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes "excessively burdensome requirements" on any class of voters.  See *Storer* v. *Brown*, 415 U. S. 724, 738 (1974).[20]

_____

[20] Three comments on JUSTICE SOUTER's speculation about the nontrivial burdens that SEA 483 may impose on "tens of thousands" of Indiana citizens, *post,* at 1 (dissenting opinion), are appropriate.  First, the fact that the District Judge estimated that when the statute was passed in 2005, 43,000 citizens did not have photo identification, see 458 F. Supp. 2d 775, 807 (SD Ind. 2006), tells us nothing about the number of free photo identification cards issued since then.  Second, the

A facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange*, 552 U. S., at \_\_\_ (quoting *Washington* v. *Glucksberg*, 521 U. S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgments)). When we consider only the statute's broad application to all Indiana voters we conclude that it "imposes only a limited burden on voters' rights." *Burdick*, 504 U. S., at 439. The "'precise interests'" advanced by the State are therefore sufficient to defeat petitioners' facial challenge to SEA 483. *Id.*, at 434.

Finally we note that petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute. When evaluating a neutral, nondiscriminatory regulation of voting procedure, "[w]e must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S.

_____

fact that public transportation is not available in some Indiana counties tells us nothing about how often elderly and indigent citizens have an opportunity to obtain a photo identification at the BMV, either during a routine outing with family or friends or during a special visit to the BMV arranged by a civic or political group such as the League of Women Voters or a political party. Further, nothing in the record establishes the distribution of voters who lack photo identification. To the extent that the evidence sheds any light on that issue, it suggests that such voters reside primarily in metropolitan areas, which are served by public transportation in Indiana (the majority of the plaintiffs reside in Indianapolis and several of the organizational plaintiffs are Indianapolis organizations). Third, the indigent, elderly, or disabled need not "journey all the way to their county seat each time they wish to exercise the franchise," *post,* at 29, if they obtain a free photo identification card from the BMV. While it is true that obtaining a birth certificate carries with it a financial cost, the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates. Supposition based on extensive Internet research is not an adequate substitute for admissible evidence subject to cross-examination in constitutional adjudication.

320, 329 (2006) (quoting *Regan* v. *Time, Inc.*, 468 U. S. 641, 652 (1984) (plurality opinion))" *Washington State Grang*e, 552 U. S., at ___ (slip op., at 8).

V

In their briefs, petitioners stress the fact that all of the Republicans in the General Assembly voted in favor of SEA 483 and the Democrats were unanimous in opposing it.[21]  In her opinion rejecting petitioners' facial challenge, Judge Barker noted that the litigation was the result of a partisan dispute that had "spilled out of the state house into the courts."  458 F. Supp. 2d, at 783.  It is fair to infer that partisan considerations may have played a significant role in the decision to enact SEA 483.  If such considerations had provided the only justification for a photo identification requirement, we may also assume that SEA 483 would suffer the same fate as the poll tax at issue in *Harper.*

But if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators.  The state interests identified as justifications for SEA 483 are both neutral and sufficiently strong to require us to reject petitioners' facial attack on the statute.  The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting "the integrity and reliability of the electoral process." *Anderson,* 460 U. S., at 788, n. 9.

——————

[21] Brief for Petitioners in No. 07–25, pp. 6–9. Fifty-two Republican House members voted for the bill, 45 Democrats voted against, and 3 Democrats were excused from voting.  3 Journal of the House of Representatives of Indiana, Roll Call 259 (Mar. 21, 2005).  In the Senate, 33 Republican Senators voted in favor and 17 Democratic Senators voted against.  3 Journal of the Senate of Indiana, Roll Call 417 (Apr. 12, 2005).

Opinion of STEVENS, J.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 07–21 and 07–25

_____

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                    *v.*
MARION COUNTY ELECTION BOARD ET AL.


INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                    *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUS-
TICE ALITO join, concurring in the judgment.

The lead opinion assumes petitioners' premise that the
voter-identification law "may have imposed a special
burden on" some voters, *ante*, at 16, but holds that peti-
tioners have not assembled evidence to show that the
special burden is severe enough to warrant strict scrutiny,
*ante*, at 18–19. That is true enough, but for the sake of
clarity and finality (as well as adherence to precedent), I
prefer to decide these cases on the grounds that petition-
ers' premise is irrelevant and that the burden at issue is
minimal and justified.

To evaluate a law respecting the right to vote—whether
it governs voter qualifications, candidate selection, or the
voting process—we use the approach set out in *Burdick* v.
*Takushi*, 504 U. S. 428 (1992). This calls for application of
a deferential "important regulatory interests" standard for
nonsevere, nondiscriminatory restrictions, reserving strict

scrutiny for laws that severely restrict the right to vote. *Id.,* at 433–434 (internal quotation marks omitted). The lead opinion resists the import of *Burdick* by characterizing it as simply adopting "the balancing approach" of *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983) (majority opinion of STEVENS, J.). See *ante*, at 6; see also *ante,* at 6–7, n. 8. Although *Burdick* liberally quoted *Anderson*, *Burdick* forged *Anderson*'s amorphous "flexible standard" into something resembling an administrable rule. See *Burdick, supra,* at 434. Since *Burdick*, we have repeatedly reaffirmed the primacy of its two-track approach. See *Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351, 358 (1997); *Clingman* v. *Beaver*, 544 U. S. 581, 586–587 (2005). "[S]trict scrutiny is appropriate only if the burden is severe." *Id.,* at 592. Thus, the first step is to decide whether a challenged law severely burdens the right to vote. Ordinary and widespread burdens, such as those requiring "nominal effort" of everyone, are not severe. See *id.,* at 591, 593–597. Burdens are severe if they go beyond the merely inconvenient. See *Storer* v. *Brown*, 415 U. S. 724, 728–729 (1974) (characterizing the law in *Williams* v. *Rhodes*, 393 U. S. 23 (1968), as "severe" because it was "so burdensome" as to be "'virtually impossible'" to satisfy).

Of course, we have to identify a burden before we can weigh it. The Indiana law affects different voters differently, *ante*, at 14–16, but what petitioners view as the law's several light and heavy burdens are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters. To vote in person in Indiana, *everyone* must have and present a photo identification that can be obtained for free. The State draws no classifications, let alone discriminatory ones, except to establish *optional* absentee and provisional balloting for certain poor, elderly, and institutionalized voters and for religious objectors. Nor are voters who already have photo identifications exempted from the burden, since those

voters must maintain the accuracy of the information displayed on the identifications, renew them before they expire, and replace them if they are lost.

The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes. In the course of concluding that the Hawaii laws at issue in *Burdick* "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote," 504 U. S., at 439, we considered the laws and their reasonably foreseeable effect on *voters generally*. See *id.,* at 436–437. We did not discuss whether the laws had a severe effect on Mr. Burdick's own right to vote, given his particular circumstances. That was essentially the approach of the *Burdick* dissenters, who would have applied strict scrutiny to the laws because of their effect on "some voters." See *id.,* at 446 (KENNEDY, J., dissenting); see also *id.,* at 448 ("The majority's analysis ignores the inevitable and significant burden a write-in ban imposes upon *some individual voters* . . . ." (emphasis added)). Subsequent cases have followed *Burdick*'s generalized review of nondiscriminatory election laws. See, *e.g., Timmons, supra,* at 361–362; *Clingman, supra,* at 590–591, 592–593. Indeed, *Clingman*'s holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden.

Not all of our decisions predating *Burdick* addressed whether a challenged voting regulation severely burdened the right to vote, but when we began to grapple with the magnitude of burdens, we did so categorically and did not consider the peculiar circumstances of individual voters or candidates. See, *e.g., Jenness* v. *Fortson*, 403 U. S. 431, 438–441 (1971). Thus, in *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), we did not link the State's interest in inhibit-

ing party raiding with the petitioners' own circumstances. See *id.,* at 760–762.  And in *Storer* v. *Brown, supra*, we observed that the severity of the burden of a regulation should be measured according to its "nature, extent, and *likely impact." Id.,* at 738 (emphasis added).  We therefore instructed the District Court to decide on remand whether "a *reasonably diligent* independent candidate [could] be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?"  *Id.,* at 742 (emphasis added). Notably, we did not suggest that the District Court should consider whether one of the petitioners would actually find it more difficult than a reasonably diligent candidate to obtain the required signatures.  What mattered was the general assessment of the burden.

Insofar as our election-regulation cases rest upon the requirements of the Fourteenth Amendment, see *Anderson, supra*, at 786, n. 7, weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence. A voter complaining about such a law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional.  See, *e.g., Washington* v. *Davis*, 426 U. S. 229, 248 (1976).  The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class.  A fortiori* it does not do so when, as here, the classes complaining of disparate impact are not even protected.\*  See *Harris* v. *McRae*, 448 U. S.

---

\*A number of our early right-to-vote decisions, purporting to rely upon the Equal Protection Clause, strictly scrutinized nondiscriminatory voting laws requiring the payment of fees.  See, *e.g., Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 670 (1966) (poll tax); *Bullock* v. *Carter*, 405 U. S. 134, 145 (1972) (ballot-access fee); *Lubin* v. *Panish*,

297, 323, and n. 26 (1980) (poverty); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442 (1985) (disability); *Gregory* v. *Ashcroft*, 501 U. S. 452, 473 (1991) (age); cf. *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–879 (1990) (First Amendment does not require exceptions for religious objectors to neutral rules of general applicability).

Even if I thought that *stare decisis* did not foreclose adopting an individual-focused approach, I would reject it as an original matter. This is an area where the dos and don'ts need to be known in advance of the election, and voter-by-voter examination of the burdens of voting regulations would prove especially disruptive. A case-by-case approach naturally encourages constant litigation. Very few new election regulations improve everyone's lot, so the potential allegations of severe burden are endless. A State reducing the number of polling places would be open to the complaint it has violated the rights of disabled voters who live near the closed stations. Indeed, it may even be the case that some laws already on the books are especially burdensome for some voters, and one can predict lawsuits demanding that a State adopt voting over the Internet or expand absentee balloting.

That sort of detailed judicial supervision of the election process would flout the Constitution's express commitment of the task to the States. See Art. I, §4. It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to

---

415 U. S. 709, 716–719 (1974) (ballot-access fee). To the extent those decisions continue to stand for a principle that *Burdick* v. *Takushi,* 504 U. S. 428 (1992), does not already encompass, it suffices to note that we have never held that legislatures must calibrate *all* election laws, even those totally unrelated to money, for their impacts on poor voters or must otherwise accommodate wealth disparities.

disadvantage a particular class. Judicial review of their handiwork must apply an objective, uniform standard that will enable them to determine, *ex ante*, whether the burden they impose is too severe.

The lead opinion's record-based resolution of these cases, which neither rejects nor embraces the rule of our precedents, provides no certainty, and will embolden litigants who surmise that our precedents have been abandoned. There is no good reason to prefer that course.

\*     \*     \*

The universally applicable requirements of Indiana's voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not "even represent a significant increase over the usual burdens of voting." *Ante*, at 15. And the State's interests, *ante*, at 7–13, are sufficient to sustain that minimal burden. That should end the matter. That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 07–21 and 07–25

————

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                       *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                       *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

Indiana's "Voter ID Law"[1] threatens to impose nontrivial burdens on the voting right of tens of thousands of the State's citizens, see *ante*, at 14–15 (lead opinion), and a significant percentage of those individuals are likely to be deterred from voting, see *ante*, at 15–16. The statute is unconstitutional under the balancing standard of *Burdick* v. *Takushi*, 504 U. S. 428 (1992): a State may not burden the right to vote merely by invoking abstract interests, be they legitimate, see *ante*, at 7–13, or even compelling, but must make a particular, factual showing that threats to its interests outweigh the particular impediments it has imposed. The State has made no such justification here, and as to some aspects of its law, it has hardly even tried. I therefore respectfully dissent from the Court's judgment

————

[1] Senate Enrolled Act No. 483, 2005 Ind. Acts p. 2005.

sustaining the statute.[2]

## I

Voting-rights cases raise two competing interests, the one side being the fundamental right to vote. See *Burdick*, *supra*, at 433 ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure'" (quoting *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 184 (1979)); see also *Purcell* v. *Gonzalez*, 549 U. S. 1, 3–4 (2006) *(per curiam); Dunn* v. *Blumstein*, 405 U. S. 330, 336 (1972); *Reynolds* v. *Sims*, 377 U. S. 533, 561–562 (1964); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370 (1886). The Judiciary is obliged to train a skeptical eye on any qualification of that right. See *Reynolds*, *supra*, at 562 ("Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized").

As against the unfettered right, however, lies the "[c]ommon sense, as well as constitutional law . . . that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick*, *supra*, at 433 (quoting *Storer* v. *Brown*, 415 U. S. 724, 730 (1974)); see also *Burdick*, *supra*, at 433 ("Election laws will invariably impose some burden upon individual voters").

Given the legitimacy of interests on both sides, we have avoided pre-set levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue. And whatever the claim, the

---

[2] I agree with the lead opinion that the petitioners in No. 07–25 have standing and that we therefore need not determine whether the remaining petitioners also have standing. See *ante*, at 5, n. 7.

Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State's reasons for imposing those precise burdens. Thus, in *Burdick*:

> "A court considering [such] a challenge . . . must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" 504 U. S., at 434 (quoting *Anderson* v. *Celebrezze*, 460 U. S. 780, 789 (1983)).

The lead opinion does not disavow these basic principles. See *ante*, at 6–7 (discussing *Burdick*); see also *ante*, at 7 ("However slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation" (internal quotation marks omitted)). But I think it does not insist enough on the hard facts that our standard of review demands.

## II

Under *Burdick*, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights," 504 U. S., at 434, upon an assessment of the "character and magnitude of the asserted [threatened] injury," *ibid.* (quoting *Anderson*, *supra*, at 789), and an estimate of the number of voters likely to be affected.

## A

The first set of burdens shown in these cases is the travel costs and fees necessary to get one of the limited variety of federal or state photo identifications needed to

cast a regular ballot under the Voter ID Law.[3] The travel is required for the personal visit to a license branch of the Indiana Bureau of Motor Vehicles (BMV), which is demanded of anyone applying for a driver's license or non-driver photo identification. See *Indiana Democratic Party* v. *Rokita*, 458 F. Supp. 2d 775, 791 (SD Ind. 2006). The need to travel to a BMV branch will affect voters according to their circumstances, with the average person probably viewing it as nothing more than an inconvenience. Poor, old, and disabled voters who do not drive a car, however, may find the trip prohibitive,[4] witness the fact that the

———————

[3] Under Indiana's law, an ID does not qualify as proof of identification unless it "satisfies all [of] the following":

"(1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual's voter registration record.

"(2) The document shows a photograph of the individual to whom the document was issued.

"(3) The document includes an expiration date, and the document:

"(A) is not expired; or

"(B) expired after the date of the most recent general election.

"(4) The document was issued by the United States or the state of Indiana." Ind. Code Ann. §3–5–2–40.5 (West 2006).

[4] The State asserts that the elderly and disabled are adequately accommodated through their option to cast absentee ballots, and so any burdens on them are irrelevant. See Brief for Respondents in No. 07–25, p. 41. But as petitioners' *amici* AARP and the National Senior Citizens Law Center point out, there are crucial differences between the absentee and regular ballot. Brief for AARP et al. as *Amici Curiae* 12–16. Voting by absentee ballot leaves an individual without the possibility of receiving assistance from poll workers, and thus increases the likelihood of confusion and error. More seriously, as the Supreme Court of Indiana has recognized, Indiana law "treats absentee voters differently from the way it treats Election Day voters," in the important sense that "an absentee ballot may not be recounted in situations where clerical error by an election officer rendered it invalid." *Horseman* v. *Keller*, 841 N. E. 2d 164, 171 (2006). The State itself notes that "election officials routinely reject absentee ballots on suspicion of forgery." Brief for Respondents in No. 07–25, p. 62. The record indicates that voters in Indiana are not unaware of these risks. One

BMV has far fewer license branches in each county than there are voting precincts.[5]  Marion County, for example, has over 900 active voting precincts, see Brief for Respondents in No. 07–21, p. 4,[6] yet only 12 BMV license branches;[7] in Lake County, there are 565 active voting precincts, see n. 6, *supra*, to match up with only 8 BMV locations;[8] and Allen County, with 309 active voting precincts, see *ibid.*,[9] has only 3 BMV license branches.[9]  The same pattern holds in counties with smaller populations.  Brown County has 12 active voter precincts, see *ibid.*, and only one BMV office;[10] while there were 18 polling places available in Fayette County's 2007 municipal primary,[11]

_____

elderly affiant in the District Court testified: "I don't trust [the absentee] system. . . . Because a lot of soldiers vote like that and their votes wasn't counted in the last election according to what I read, absentee." App. 209 (deposition of David Harrison).

It is one thing (and a commendable thing) for the State to make absentee voting available to the elderly and disabled; but it is quite another to suggest that, because the more convenient but less reliable absentee ballot is available, the State may freely deprive the elderly and disabled of the option of voting in person.

[5] Under Indiana law, county executives must locate a polling place within five miles of the closest boundary of each voting precinct, and, with limited exceptions, no precinct may cover more than 1,200 active voters at the time it is established.  See Brief for Respondents in No. 07–21, p. 3 (citing Ind. Code Ann. §§3–11–8–3(b), 3–11–1.5–3).  The result is that the number of polling places tends to track the number of voting precincts in a county.  In Henry County, for example, there are 42 active precincts, see n. 6, *infra*, and 42 polling places have been approved for the 2008 elections, see n. 13, *infra*.

[6] See also Count of Active Precincts by County, online at http://www.in.gov/sos/pdfs/Precincts_by_County_and_State_022706.pdf (all Internet materials as visited Apr. 21, 2008, and available in Clerk of Court's case file).

[7] See Marion County License Branches, http://www.in.gov/bmv/3134.htm.

[8] See Lake County, http://www.in.gov/bmv/3150.htm.

[9] See Allen County, http://www.in.gov/bmv/2954.htm.

[10] See Brown County, http://www.in.gov/bmv/3302.htm.

[11] See http://www.co.fayette.in.us/2007%20polling_locations_munic.

there was only 1 BMV license branch;[12] and Henry County, with 42 polling places approved for 2008 elections,[13] has only 1 BMV office.

The burden of traveling to a more distant BMV office rather than a conveniently located polling place is probably serious for many of the individuals who lack photo identification.[14] They almost certainly will not own cars, see Brief for Current and Former State Secretaries of State as *Amici Curiae* 11, and public transportation in Indiana is fairly limited. According to a report published by Indiana's Department of Transportation in August 2007, 21 of Indiana's 92 counties have no public transportation system at all,[15] and as of 2000, nearly 1 in every 10

——————

htm.

[12] See Fayette County, http://www.in.gov/bmv/3246.htm.

[13] See News Release, Henry County, Indiana, Polling Places Approved for the 2008 Elections, http://www.henryco.net/cm/node/52.

[14] The travel burdens might, in the future, be reduced to some extent by Indiana's commendable "BMV2You" mobile license branch, which will travel across the State for an average of three days a week, and provide BMV services (including ID services). See http://www.in.gov/bmv/3554.htm. The program does not count in my analysis, however, because the program was only recently opened in August 2007, see Indiana BMV Opens License Branch at State Fair, http://www.in.gov/newsroom.htm?detailContent=93_10400.htm, and its long-term service schedule has yet to be determined.

[15] Indiana Public Transit: Annual Report 2006, p. 29, http://www.in.gov/indot/files/INDOT_2006.pdf (hereinafter Annual Report). The 21 counties with no public transportation, according to the study, are: Adams, Blackford, Brown, Carroll, Clay, De Kalb, Gibson, Jennings, Lagrange, Parke, Perry, Posey, Putnam, Rush, Spencer, Steuben, Tipton, Vermillion, Warren, Warrick, and Whitley Counties. See *ibid.*

A Website of the American Public Transportation Association, which compiles public transit information across the States, confirms that each of those 21 counties lacks any public transportation offerings, and in fact adds another 13 counties to this category: Boone, Decatur, Fayette, Fulton, Hancock, Hendricks, Huntington, Miami, Morgan, Noble, Pike, Shelby, and Wells. See Transit Systems in Indiana, http://www.publictransportation.org/systems/state.asp?state=IN#A44.

voters lived within 1 of these 21 counties.[16]  Among the counties with some public system, 21 provide service only within certain cities, and 32 others restrict public transportation to regional county service, leaving only 18 that offer countywide public transportation, see n. 15, *supra.* State officials recognize the effect that travel costs can have on voter turnout, as in Marion County, for example, where efforts have been made to "establis[h] most polling places in locations even more convenient than the statutory minimum," in order to "provid[e] for neighborhood voting."  Brief for Respondents in No. 07–21, pp. 3–4.

   Although making voters travel farther than what is convenient for most and possible for some does not amount to a "severe" burden under *Burdick*, that is no reason to ignore the burden altogether.  It translates into an obvious economic cost (whether in work time lost, or getting and paying for transportation) that an Indiana voter must bear to obtain an ID.

   For those voters who can afford the roundtrip, a second financial hurdle appears: in order to get photo identification for the first time, they need to present "'a birth certificate, a certificate of naturalization, U. S. veterans photo identification, U. S. military photo identification, or a U. S. passport.'"  *Ante*, at 14, n. 16 (lead opinion) (quoting Ind. Admin. Code, tit. 140, §7–4–3 (2008)).  As the lead opinion says, the two most common of these documents come at a price: Indiana counties charge anywhere from $3 to $12 for a birth certificate (and in some other States the fee is significantly higher), see *ante*, at 14, n. 16, and

--------------------

The discrepancy appears to arise, in part, from the fact that the American Public Transportation Association has not counted demand response systems that have been established in at least 6 of these 13 counties.  See Annual Report 36, 50, 56, 96, 110, 144.

   [16] In 2000, approximately 9% of Indiana's population lived within 1 of these 21 counties.  See County and City Extra: Special Decennial Census Edition 169, 176 (D. Gaquin & K. DeBrandt eds. 2002).

that same price must usually be paid for a first-time pass-
port, since a birth certificate is required to prove U. S.
citizenship by birth. The total fees for a passport, more-
over, are up to about $100.[17] So most voters must pay at
least one fee to get the ID necessary to cast a regular
ballot.[18] As with the travel costs, these fees are far from
shocking on their face, but in the *Burdick* analysis it
matters that both the travel costs and the fees are dispro-
portionately heavy for, and thus disproportionately likely
to deter, the poor, the old, and the immobile.

## B

To be sure, Indiana has a provisional-ballot exception to
the ID requirement for individuals the State considers
"indigent"[19] as well as those with religious objections to
being photographed, see *ante*, at 15 (lead opinion), and
this sort of exception could in theory provide a way around
the costs of procuring an ID. But Indiana's chosen excep-
tion does not amount to much relief.

---

[17] See Department of State, How to Apply in Person for a Passport,
http://travel.state.gov/passport/get/first/first_830.html; Department of
State, Passport Fees (Feb. 1, 2008), http://travel.state.gov/passport/
get/fees/fees_837.html (total fees of $100 for a passport book and $45 for
a passport card for individuals 16 and older).

[18] The lead opinion notes that "the record does not provide even a
rough estimate of how many indigent voters lack copies of their birth
certificates." *Ante*, at 19, n. 20. But the record discloses no reason to
think that any appreciable number of poor voters would need birth
certificates absent the Voter ID Law, and no reason to believe that poor
people would spend money to get them if they did not need them.

[19] To vote by provisional ballot, an individual must (at the circuit
court clerk's office) sign an affidavit affirming that she is "indigent" and
"unable to obtain proof of identification without payment of a fee." Ind.
Code Ann. §3–11.7–5–2.5(c)(2)(A). Indiana law does not define the key
terms "indigent" or "unable," but I will assume for present purposes
that the Indiana Supreme Court will eventually construe these terms
broadly, so that the income threshold for indigency is at least at the
federal poverty level, and so that the exception covers even individuals
who are facing only short-term financial difficulties.

The law allows these voters who lack the necessary ID to sign the poll book and cast a provisional ballot. See 458 F. Supp. 2d, at 786 (citing Ind. Code Ann. §3–11–8–25.1 (West Supp. 2007)). As the lead opinion recognizes, though, *ante*, at 15, that is only the first step; to have the provisional ballot counted, a voter must then appear in person before the circuit court clerk or county election board within 10 days of the election, to sign an affidavit attesting to indigency or religious objection to being photographed (or to present an ID at that point),[20] see 458 F. Supp. 2d, at 786. Unlike the trip to the BMV (which, assuming things go smoothly, needs to be made only once every four years for renewal of nondriver photo identification, see *id.*), this one must be taken every time a poor person or religious objector wishes to vote, because the State does not allow an affidavit to count in successive elections. And unlike the trip to the BMV (which at least has a handful of license branches in the more populous counties), a county has only one county seat. Forcing these people to travel to the county seat every time they try to vote is particularly onerous for the reason noted already, that most counties in Indiana either lack public transportation or offer only limited coverage. See *supra*, at 6–7.

That the need to travel to the county seat each election amounts to a high hurdle is shown in the results of the 2007 municipal elections in Marion County, to which Indiana's Voter ID Law applied. Thirty-four provisional ballots were cast, but only two provisional voters made it

_____

[20] Indiana law allows voters to cast a provisional ballot at the county clerk's office starting 29 days prior to election day until noon of the day prior to election day, see Ind. Code Ann. §3–11.7–5–2.5, and this might enable some voters to make only one burdensome trip to the county seat. But for the voters who show up at the polls to vote and are there told that they lack the photo identification needed to cast a regular ballot, the Voter ID Law effectively forces them to make two trips.

to the County Clerk's Office within the 10 days. See Brief for Respondents in No. 07–21, pp. 8–9. All 34 of these aspiring voters appeared at the appropriate precinct; 33 of them provided a signature, and every signature matched the one on file; and 26 of the 32 voters whose ballots were not counted had a history of voting in Marion County elections. See *id.*, at 9.

All of this suggests that provisional ballots do not obviate the burdens of getting photo identification. And even if that were not so, the provisional-ballot option would be inadequate for a further reason: the indigency exception by definition offers no relief to those voters who do not consider themselves (or would not be considered) indigent but as a practical matter would find it hard, for nonfinancial reasons, to get the required ID (most obviously the disabled).

## C

Indiana's Voter ID Law thus threatens to impose serious burdens on the voting right, even if not "severe" ones, and the next question under *Burdick* is whether the number of individuals likely to be affected is significant as well. Record evidence and facts open to judicial notice answer yes.

Although the District Court found that petitioners failed to offer any reliable empirical study of numbers of voters affected, see *ante*, at 17 (lead opinion),[21] we may accept that court's rough calculation that 43,000 voting-age residents lack the kind of identification card required by Indiana's law. See 458 F. Supp. 2d, at 807. The District

---

[21] Much like petitioners' statistician, the BMV "has not been able to determine the approximate number of Indiana residents of voting age who are without an Indiana driver's license or identification card," 458 F. Supp. 2d 775, 791 (SD Ind. 2006), but the BMV does acknowledge "that there are persons who do not currently have [the required ID] and who are, or who will be, eligible to vote at the next election," *ibid.*

Court made that estimate by comparing BMV records reproduced in petitioners' statistician's report with U. S. Census Bureau figures for Indiana's voting-age population in 2004, see *ibid.*, and the State does not argue that these raw data are unreliable.

The State, in fact, shows no discomfort with the District Court's finding that an "estimated 43,000 individuals" (about 1% of the State's voting-age population) lack a qualifying ID. Brief for Respondents in No. 07–25, p. 25. If the State's willingness to take that number is surprising, it may be less so in light of the District Court's observation that "several factors . . . suggest the percentage of Indiana's voting age population with photo identification is actually lower than 99%," 458 F. Supp. 2d, at 807, n. 43,[22] a suggestion in line with national surveys showing

———————

[22] The District Court explained:

"[O]ur simple comparison of raw numbers does not take into account: individuals who have died but whose Indiana driver's license or identification cards have not expired; individuals who have moved outside the state and no longer consider themselves Indiana residents but who still retain a valid Indiana license or identification card; individuals who have moved into Indiana and now consider themselves Indiana residents but have not yet obtained an Indiana license or identification; and individuals, such as students, who are residing in Indiana temporarily, are registered to vote in another state, but have obtained an Indiana license or identification." *Id.*, at 807, n. 43.

The District Court also identified three factors that, in its view, might require deductions of the 43,000 figure. First, the District Court noted that BMV records do not cover all forms of identification that may be used to vote under the Voter ID Law (*e.g.,* federal photo identification, such as a passport). This is a valid consideration, but is unlikely to overcome the additions that must be made for the various factors listed above. Second, the court noted that the BMV records do not account for the exceptions to the photo identification requirement (such as the indigency and absentee-ballot exceptions). This factor does not warrant a deduction of the 43,000 number because, as I have argued, the indigency exception imposes serious burdens of its own, see *supra*, at 8–10, and the absentee-ballot exception is not a wholly adequate substitute for voting in person, see n. 4, *supra*. Finally, the

roughly 6–10% of voting-age Americans without a state-issued photo-identification card. See Brief for Petitioners in No. 07–21, pp. 39–40, n. 17 (citing National Commission on Election Reform, To Assure Pride and Confidence: Task Force Reports, ch. VI: Verification of Identity, p. 4 (Aug. 2001), http://webstorage3.mcpa.virginia.edu/commisions/comm_2001_taskforce.pdf). We have been offered no reason to think that Indiana does a substantially better job of distributing IDs than other States.[23]

So a fair reading of the data supports the District Court's finding that around 43,000 Indiana residents lack the needed identification, and will bear the burdens the law imposes. To be sure, the 43,000 figure has to be discounted to some extent, residents of certain nursing homes being exempted from the photo identification requirement. 458 F. Supp. 2d, at 786. But the State does not suggest that this narrow exception could possibly reduce 43,000 to an insubstantial number.[24]

——————

District Court noted that many individuals are not registered to vote. For reasons I lay out in note 24, *infra*, I am not convinced that this fact is relevant at all.

[23] Although the lead opinion expresses confidence that the percentage of voters without the necessary photo ID will steadily decrease, see *ante*, at 4, n. 6, and suggests that the number may already have dropped, see *ante*, at 18, n. 20, there is reason to be less sanguine. See ACLU Sues To Halt License Revocation, Fort Wayne J. Gazette, Feb. 9, 2008, p. 3C ("The American Civil Liberties Union is suing the state to prevent the possible revocation of up to 56,000 driver's licenses that don't match information in a Social Security database. Many of the mismatches were created by typographical errors or by people getting married and changing their last names, the [BMV] said last week when it announced it had sent warning letters to about 206,000 people in Indiana"); see also Dits, Court Date Set for Bid To Stop BMV, South Bend Tribune, Feb. 21, 2008; Who To Blame in Name Game? Many Caught in Name Game; Merging BMV, Social Security Databases Forcing Many To Hire Lawyers, The Post-Tribune, Jan. 8, 2008, p. A5; Snelling, Name Issue Blocks License, Merrillville Post-Tribune, Jan. 7, 2008, p. A6.

[24] The State does imply that we should further discount the 43,000

The upshot is this. Tens of thousands of voting-age residents lack the necessary photo identification. A large proportion of them are likely to be in bad shape economically, see 472 F. 3d 949, 951 (CA7 2007) ("No doubt most people who don't have photo ID are low on the economic ladder"); cf. *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972) ("[W]e would ignore reality were we not to recognize that this system falls with unequal weight on voters . . . according to their economic status").[25] The Voter ID Law places hurdles in the way of either getting an ID or of voting provisionally, and they translate into nontrivial economic costs. There is accordingly no reason to doubt that a significant number of state residents will be discouraged or

_____

estimate to exclude citizens who are not registered to vote, or who are registered but not planning to vote. See Brief for Respondents in No. 07–25, p. 25; see also *ante*, at 17 (lead opinion) ("[T]he evidence in the record does not provide us with the number of registered voters without photo identification"). But that argument is flatly contradicted by this Court's settled precedent. As our cases have recognized, disfranchisement is disfranchisement, whether or not the disfranchised voter would have voted if given the choice. That is why in *Dunn* v. *Blumstein*, 405 U. S. 330 (1972), the Court did not ask whether any significant number of individuals deprived of the right to vote by durational residence requirements would actually have chosen to vote. And in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), the Court did not pause to consider whether any of the qualified voters deterred by the $1.50 poll tax would have opted to vote if there had been no fee. Our cases make clear that the Constitution protects an individual's ability to vote, not merely his decision to do so.

[25] Studies in other States suggest that the burdens of an ID requirement may also fall disproportionately upon racial minorities. See Overton, Voter Identification, 105 Mich. L. Rev. 631, 659 (2007) ("In 1994, the U. S. Department of Justice found that African-Americans in Louisiana were four to five times less likely than white residents to have government-sanctioned photo identification"); *id.*, at 659–660 (describing June 2005 study by the Employment and Training Institute at the University of Wisconsin-Milwaukee, which found that while 17% of voting-age whites lacked a valid driver's license, 55% of black males and 49% of black females were unlicensed, and 46% of Latino males and 59% of Latino females were similarly unlicensed).

disabled from voting. Cf. 458 F. Supp. 2d, at 823 ("We do not doubt that such individuals exist somewhere, even though Plaintiffs were unable to locate them"); 472 F. 3d, at 952 ("No doubt there are at least a few [whom the law will deter from voting] in Indiana . . ."); see also *ante*, at 15 (lead opinion).

Petitioners, to be sure, failed to nail down precisely how great the cohort of discouraged and totally deterred voters will be, but empirical precision beyond the foregoing numbers has never been demanded for raising a voting-rights claim. Cf. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. ___, ___ (2008) (ROBERTS, C. J., concurring) (slip op., at 4) ("Nothing in my analysis requires the parties to produce studies regarding voter perceptions on this score"); *Dunn* v. *Blumstein*, 405 U. S. 330, 335, n. 5 (1972) ("[I]t would be difficult to determine precisely how many would-be voters throughout the country cannot vote because of durational residence requirements"); *Bullock*, *supra*, at 144 (taking account of "the obvious likelihood" that candidate filing fees would "fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs"). While of course it would greatly aid a plaintiff to establish his claims beyond mathematical doubt, he does enough to show that serious burdens are likely.

Thus, petitioners' case is clearly strong enough to prompt more than a cursory examination of the State's asserted interests. And the fact that Indiana's photo identification requirement is one of the most restrictive in the country, see Brief for Current and Former State Secretaries of State as *Amici Curiae* 27–30 (compiling state voter-identification statutes); see also Brief for Texas et al. as *Amici Curiae* 10–13 (same),[26] makes a critical examina-

———————

[26] Unlike the Help America Vote Act of 2002, 116 Stat. 1666, 42 U. S. C. §5301 *et seq.* (2000 ed., Supp. V), which generally requires

tion of the State's claims all the more in order.  Cf. *Ran-*

_____

proof of identification but allows for a variety of documents to qualify, see *ante*, at 8–9 (lead opinion), Indiana accepts only limited forms of federally issued or state-issued photo identification, see n. 3, *supra*, and does not allow individuals lacking the required identification to cast a regular ballot at the polls.  Only one other State, Georgia, currently restricts voters to the narrow forms of government-issued photo identification.  See Ga. Code Ann. §21–2–417 (Supp. 2007).  But a birth certificate is not needed to get a Georgia voter identification card.  See Ga. Code Ann. §21–2–417.1 (Supp. 2007); Ga. Comp. Rules & Regs., Rule 183–1–20.01 (2006).

Missouri's Legislature passed a restrictive photo identification law comparable to Indiana's, but the Missouri Supreme Court struck it down as violative of the state constitution.  *Weinschenk* v. *State*, 203 S. W. 3d 201 (2006) *(per curiam)*.  Florida requires photo identification, but permits the use of several forms, including a debit or credit card; military identification; student identification; retirement center identification; neighborhood center identification; and public assistance identification.  See Fla. Stat. Ann. §101.043(1) (West Supp. 2008).  Moreover, a Florida voter who lacks photo identification may cast a provisional ballot, and that ballot will be counted so long as the signature on the ballot matches the one on the voter's registration. §§101.043(2), 101.048.

All other States that require identification at the polls either allow voters to identify themselves using a variety of documents, see Ala. Code §17–9–30 (2007); Alaska Stat. §15.15.225 (2006); Ariz. Rev. Stat. Ann. §16–579 (West 2006); Ark. Code Ann. §7–5–305(a)(8) (2007); Colo. Rev. Stat. §§1–1–104(19.5), 1–7–110 (2007); Ky. Rev. Stat. Ann. §117.227 (Lexis 2004); Mont. Code Ann. §13–13–114 (2007); N. M. Stat. Ann. §§1–1–24, 1–12–7.1, as amended by 2008 N. M. Laws ch. 59; §1–12–8 (Cum. Supp. 2007); Ohio Rev. Code Ann. §§3503.16(B)(1), 3505.18 (Lexis Supp. 2007); S. C. Code Ann. §§7–5–125, 7–13–710 (Cum. Supp. 2007); Tenn. Code Ann. §2–7–112 (2003); Texas Elec. Code Ann. §§63.001–63.009 (West 2003 and Supp. 2007); §63.0101 (West Supp. 2007); Wash. Rev. Code §29A.44.205 (2006), or allow voters lacking identification to cast a regular ballot upon signing an affidavit (or providing additional identifying information), see Conn. Gen. Stat. §9–261 (2007); Del. Code Ann., Tit. 15, §4937 (2007); Haw. Rev. Stat. §11–136 (2006 Cum. Supp.); La. Rev. Stat. Ann. §18:562 (West Supp. 2008); Mich. Comp. Laws Ann. §168.523(1) (West Supp. 2007); N. D. Cent. Code Ann. §16.1–05–07 (Lexis Supp. 2007); S. D. Codified Laws §§12–18–6.1, 12–18–6.2 (2004); Va. Code Ann. §24.2–643 (Lexis 2006).

*dall* v. *Sorrell*, 548 U. S. 230, 253 (2006) (plurality opinion) (citing as a "danger sig[n]" that "contribution limits are substantially lower than . . . comparable limits in other States," and concluding that "[w]e consequently must examine the record independently and carefully to determine whether [the] limits are 'closely drawn' to match the State's interests"); *id.*, at 284, 288 (SOUTER, J., dissenting) (finding that deference was appropriate on the reasoning that limits were "consistent with limits set by the legislatures of many other States, all of them with populations larger than Vermont's," and that "[t]he Legislature of Vermont evidently tried to account for the realities of campaigning in Vermont").

### III

Because the lead opinion finds only "limited" burdens on the right to vote, see *ante*, at 18, it avoids a hard look at the State's claimed interests. See *ante*, at 7–13. But having found the Voter ID Law burdens far from trivial, I have to make a rigorous assessment of "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' [and] 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U. S., at 434 (quoting *Anderson*, 460 U. S., at 789).

As this quotation from *Burdick* indicates, the interests claimed to justify the regulatory scheme are subject to discount in two distinct ways. First, the generalities raised by the State have to be shaved down to the precise "aspect[s of claimed interests] addressed by the law at issue." *California Democratic Party* v. *Jones*, 530 U. S. 567, 584 (2000) (emphasis omitted); see *ibid.* (scrutiny of state interests "is not to be made in the abstract, by asking whether [the interests] are highly significant values; but rather by asking whether the *aspect* of [those interests] addressed by the law at issue is highly significant"

(emphasis in original)).  And even if the State can show particularized interests addressed by the law, those interests are subject to further discount depending on "the extent to which [they] make it necessary to burden the plaintiff's rights." *Burdick*, *supra*, at 434 (internal quotation marks omitted).

As the lead opinion sees it, the State has offered four related concerns that suffice to justify the Voter ID Law: modernizing election procedures, combating voter fraud, addressing the consequences of the State's bloated voter rolls, and protecting public confidence in the integrity of the electoral process.  See *ante*, at 7–13.  On closer look, however, it appears that the first two (which are really just one) can claim modest weight at best, and the latter two if anything weaken the State's case.

A

The lead opinion's discussion of the State's reasons begins with the State's asserted interests in "election modernization," *ante*, at 8–10, and in combating voter fraud, see *ante*, at 11–13.  Although these are given separate headings, any line drawn between them is unconvincing; as I understand it, the "effort to modernize elections," Brief for Respondents in No. 07–25, p. 12, is not for modernity's sake, but to reach certain practical (or political) objectives.[27]  In any event, if a proposed modernization were in fact aimless, if it were put forward as change for change's sake, a State could not justify any appreciable burden on the right to vote that might ensue; useless technology has no constitutional value.  And in fact that is not the case here.  The State says that it adopted the ID law principally to combat voter fraud, and it is this claim,

──────────

[27] See generally R. Saltman, The History and Politics of Voting Technology: In Quest of Integrity and Public Confidence (2006) (tracing the history of changes in methods of voting in the United States, and the social and political considerations behind them).

not the slogan of "election modernization," that warrants attention.

1

There is no denying the abstract importance, the compelling nature, of combating voter fraud. See *Purcell*, 549 U. S., at 4 (acknowledging "the State's compelling interest in preventing voter fraud"); cf. *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process"). But it takes several steps to get beyond the level of abstraction here.

To begin with, requiring a voter to show photo identification before casting a regular ballot addresses only one form of voter fraud: in-person voter impersonation. The photo ID requirement leaves untouched the problems of absentee-ballot fraud, which (unlike in-person voter impersonation) is a documented problem in Indiana, see 458 F. Supp. 2d, at 793; of registered voters voting more than once (but maintaining their own identities) in different counties or in different States; of felons and other disqualified individuals voting in their own names; of vote buying; or, for that matter, of ballot-stuffing, ballot miscounting, voter intimidation, or any other type of corruption on the part of officials administering elections. See Brief for Brennan Center for Justice et al. as *Amici Curiae* 7.

And even the State's interest in deterring a voter from showing up at the polls and claiming to be someone he is not must, in turn, be discounted for the fact that the State has not come across a single instance of in-person voter impersonation fraud in all of Indiana's history. See 458 F. Supp. 2d, at 792–793; see also *ante*, at 11–13 (lead opinion). Neither the District Court nor the Indiana General Assembly that passed the Voter ID Law was given any evidence whatsoever of in-person voter impersonation fraud in the State. See 458 F. Supp. 2d, at 793. This

absence of support is consistent with the experience of
several veteran poll watchers in Indiana, each of whom
submitted testimony in the District Court that he had
never witnessed an instance of attempted voter imper-
sonation fraud at the polls. *Ibid.* It is also consistent with
the dearth of evidence of in-person voter impersonation in
any other part of the country. See *ante*, at 11, n. 11 (lead
opinion) (conceding that there are at most "scattered
instances of in-person voter fraud"); see also Brief for
Brennan Center for Justice, *supra*, at 11–25, 25 (demon-
strating that "the national evidence—including the very
evidence relied on by the courts below—suggests that the
type of voting fraud that may be remedied by a photo ID
requirement is virtually nonexistent: the 'problem' of voter
impersonation is not a real problem at all").[28]

The State responds to the want of evidence with the
assertion that in-person voter impersonation fraud is hard
to detect. But this is like saying the "man who wasn't
there" is hard to spot,[29] and to know whether difficulty in
detection accounts for the lack of evidence one at least has
to ask whether in-person voter impersonation is (or would
be) relatively harder to ferret out than other kinds of fraud
(*e.g.,* by absentee ballot) which the State has had no trou-
ble documenting. The answer seems to be no; there is
reason to think that "impersonation of voters is . . . the
most likely type of fraud to be discovered." U. S. Election
Assistance Commission, Election Crimes: An Initial Re-

———————

[28] The lack of evidence of in-person voter impersonation fraud is not
for failure to search. See, *e.g.,* Lipton & Urbina, In 5-Year Effort, Scant
Evidence of Voter Fraud, N. Y. Times, Apr. 12, 2007, p. A1 ("Five years
after the Bush Administration began a crackdown on voter fraud, the
Justice Department has turned up virtually no evidence of any organ-
ized effort to skew federal elections, according to court records and
interviews").

[29] "As I was going up the stair / I met a man who wasn't there." H.
Mearns, Antigonish, reprinted in Best Remembered Poems 107 (M.
Gardner ed. 1992).

view and Recommendations for Future Study 9 (Dec. 2006), http://www.eac.gov/clearinghouse/docs/reports-and-surveys-2006electioncrimes.pdf/attachment_download/file (hereinafter EAC Report). This is in part because an individual who impersonates another at the polls commits his fraud in the open, under the scrutiny of local poll workers who may well recognize a fraudulent voter when they hear who he claims to be. See Brief for Respondents in No. 07–21, p. 6 ("[P]recinct workers may recognize an imposter, and precinct election workers have the authority to challenge persons appearing to vote if the election board member 'is not satisfied that a person who offers to vote is the person who the person represents the person to be'" (quoting Ind. Code Ann. §3–11–8–27 (West 2006))).

The relative ease of discovering in-person voter impersonation is also owing to the odds that any such fraud will be committed by "organized groups such as campaigns or political parties" rather than by individuals acting alone. L. Minnite & D. Callahan, Securing the Vote: An Analysis of Election Fraud 14 (2003). It simply is not worth it for individuals acting alone to commit in-person voter impersonation, which is relatively ineffectual for the foolish few who may commit it. If an imposter gets caught, he is subject to severe criminal penalties. See, *e.g.,* Ind. Code Ann. §3–14–2–9 (making it a felony "knowingly [to] vot[e] or offe[r] to vote at an election when the person is not registered or authorized to vote"); §3–14–2–11 (with certain exceptions, "a person who knowingly votes or offers to vote in a precinct except the one in which the person is registered and resides" commits a felony); §3–14–2–12(1) (making it a felony "knowingly [to] vot[e] or mak[e] application to vote in an election in a name other than the person's own"); §3–14–2–12(2) (a person who, "having voted once at an election, knowingly applies to vote at the same election in the person's own name or any other name" commits a felony); see also 42 U. S. C. §1973i(e)(1)

(any individual who "votes more than once" in certain federal elections "shall be fined not more than $10,000 or imprisoned not more than five years, or both"). And even if he succeeds, the imposter gains nothing more than one additional vote for his candidate. See EAC Report 9 (in-person voter impersonation "is an inefficient method of influencing an election"); J. Levitt, The Truth about Voter Fraud 7 (2007) ("[F]raud by individual voters is a singularly foolish and ineffective way to attempt to win an election. Each act of voter fraud in connection with a federal election risks five years in prison and a $10,000 fine, in addition to any state penalties. In return, it yields at most one incremental vote. That single extra vote is simply not worth the price" (footnote omitted)); cf. 472 F. 3d, at 951 ("[A] vote in a political election rarely has any *instrumental* value, since elections for political office at the state or federal level are never decided by just one vote" (emphasis in original)).

In sum, fraud by individuals acting alone, however difficult to detect, is unlikely. And while there may be greater incentives for organized groups to engage in broadgauged in-person voter impersonation fraud, see Minnite & Callahan, *supra*, at 20, it is also far more difficult to conceal larger enterprises of this sort. The State's argument about the difficulty of detecting the fraud lacks real force.

2

Nothing else the State has to say does much to bolster its case. The State argues, for example, that even without evidence of in-person voter impersonation in Indiana, it is enough for the State to show that "opportunities [for such fraud] are transparently obvious in elections without identification checks," Brief for Respondents in No. 07–25, p. 54. Of course they are, but Indiana elections before the Voter ID Law were not run "without identification checks";

on the contrary, as the Marion County Election Board informs us, "[t]ime-tested systems were in place to detect in-person voter impersonation fraud before the challenged statute was enacted," Brief for Respondents in No. 07–21, p. 6. These included hiring poll workers who were precinct residents familiar with the neighborhood, and making signature comparisons, each effort being supported by the criminal provisions mentioned before. *Id.*, at 6–8.

For that matter, the deterrence argument can do only so much work, since photo identification is itself hardly a failsafe against impersonation. Indiana knows this, and that is why in 2007 the State began to issue redesigned driver's licenses with digital watermarking.[30] The State has made this shift precisely because, in the words of its BMV, "visual inspection is not adequate to determine the authenticity" of driver's licenses. See Indiana BMV, *supra*, n. 30. Indeed, the BMV explains that the digital watermarks (which can be scanned using equipment that, so far, Indiana does not use at polling places) is needed to "tak[e] the guesswork out of inspection." *Ibid.*[31] So, at least until polling places have the machines and special software to scan the new driver's licenses, and until all the licenses with the older designs expire (the licenses issued after 2006 but before the 2007 redesigning are good until 2012, see 458 F. Supp. 2d, at 791), Indiana's law does no more than assure that any in-person voter fraud will take place with fake IDs, not attempted signature forgery.

_____

[30] See Indiana BMV, Digital Drivers License: Frequently Asked Questions, "What is a digital watermark and why is Indiana incorporating it into their driver license?", http://www.in.gov/bmv/3382.htm.

[31] In the words of Indiana's Governor, Mitch Daniels: "'Not very long ago, Indiana driver's licenses were a late-night talk show joke [because of] the ease of their fraudulent issuance and also their duplication . . . . [The new design] will make particularly their duplication dramatically more difficult.'" Udell, Digital Driver's Licenses Designed To Stem ID Theft, Evansville Courier, June 7, 2007, p. B6.

Despite all this, I will readily stipulate that a State has an interest in responding to the risk (however small) of in-person voter impersonation. See *ante*, at 12 (lead opinion). I reach this conclusion, like others accepted by the Court, because "'[w]here a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empiri-cal legislative judgments.'" *Randall*, 548 U. S., at 285 (SOUTER, J., dissenting) (quoting *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring)). Weight is owed to the legislative judgment as such. But the ultimate valuation of the particular interest a State asserts has to take account of evidence against it as well as legislative judgments for it (certainly when the law is one of the most restrictive of its kind, see n. 26, *supra*), and on this record it would be unreasonable to accord this assumed state interest more than very modest significance.[32]

3

The antifraud rationale is open to skepticism on one further ground, what *Burdick* spoke of as an assessment of the degree of necessity for the State's particular course of action. Two points deserve attention, the first being that

_____

[32] On such flimsy evidence of fraud, it would also ignore the lessons of history to grant the State's interest more than modest weight, as the interest in combating voter fraud has too often served as a cover for unnecessarily restrictive electoral rules. See F. Ogden, The Poll Tax in the South 9 (1958) ("In Arkansas and Texas, the argument was fre-quently presented that a poll tax payment prerequisite would purify elections by preventing repeaters and floaters from voting"); see also Brief for Historians and Other Scholars as *Amici Curiae* 4–15 (detailing abuses); R. Hayduk, Gatekeepers to the Franchise: Shaping Election Administration in New York 36 (2005) ("In both historical and contem-porary contexts certain groups have had an interest in alleging fraud and thereby shaping electoral rules and practices in a restrictive direction, and other groups have had an opposite interest").

the State has not even tried to justify its decision to im-
plement the photo identification requirement immediately
on passage of the new law.  A phase-in period would have
given the State time to distribute its newly designed li-
censes, and to make a genuine effort to get them to indi-
viduals in need, and a period for transition is exactly what
the Commission on Federal Election Reform, headed by
former President Carter and former Secretary of State
Baker, recommended in its report.  See Building Confi-
dence in U. S. Elections §2.5 (Sept. 2005), App. 136, 140
(hereinafter Carter-Baker Report) ("For the next two
federal elections, until January 1, 2010, in states that
require voters to present ID at the polls, voters who fail to
do so should nonetheless be allowed to cast a provisional
ballot, and their ballot would count if their signature is
verified").  During this phase-in period, the report said,
States would need to make "efforts to ensure that all
voters are provided convenient opportunities to obtain" the
required identification.  *Id.*, at 141.  The former President
and former Secretary of State explained this recommenda-
tion in an op-ed essay:

> "Yes, we are concerned about the approximately 12
> percent of citizens who lack a driver's license.  So we
> proposed that states finally assume the responsibility
> to seek out citizens to both register voters and provide
> them with free ID's that meet federal standards.
> States should open new offices, use social service
> agencies and deploy mobile offices to register voters.
> By connecting ID's to registration, voting participa-
> tion will be expanded."  Carter & Baker, Voting Re-
> form is in the Cards, N. Y. Times, Sept. 23, 2005, p.
> A19.

Although Indiana claims to have adopted its ID require-
ment relying partly on the Carter-Baker Report, see Brief
for Respondents in No. 07–25, pp. 5, 13, 49; see also *ante*,

at 10 (lead opinion), the State conspicuously rejected the Report's phase-in recommendation aimed at reducing the burdens on the right to vote, and just as conspicuously fails even to try to explain why.

What is left of the State's claim must be downgraded further for one final reason: regardless of the interest the State may have in adopting a photo identification requirement as a general matter, that interest in no way necessitates the particular burdens the Voter ID Law imposes on poor people and religious objectors. Individuals unable to get photo identification are forced to travel to the county seat every time they wish to exercise the franchise, and they have to get there within 10 days of the election. See *supra*, at 8–10. Nothing about the State's interest in fighting voter fraud justifies this requirement of a post-election trip to the county seat instead of some verification process at the polling places.

In briefing this Court, the State responds by pointing to an interest in keeping lines at polling places short. See Brief for Respondents in No. 07–25, p. 58. It warns that "[i]f election workers—a scarce resource in any election—must attend to the details of validating provisional ballots, voters may have to wait longer to vote," and it assures us that "[n]othing deters voting so much as long lines at the polls." *Ibid.* But this argument fails on its own terms, for whatever might be the number of individuals casting a provisional ballot, the State could simply allow voters to sign the indigency affidavit at the polls subject to review there after the election.[33] After all, the Voter ID Law already requires voters lacking photo identification to

---

[33] Florida has accommodated voters in this manner. In Florida a voter who casts a provisional ballot may have that vote counted if the voter's signature on the provisional-ballot certification matches the signature on the voter's registration. See Fla. Stat. Ann. §§101.043, 101.048. The voter is not required to make a second trip to have her provisional ballot counted.

sign, at the polling site, an affidavit attesting to proper registration. See 458 F. Supp. 2d, at 786.

Indeed, the State's argument more than fails; it backfires, in implicitly conceding that a not-insignificant number of individuals will need to rely on the burdensome provisional-ballot mechanism. What is more, as the District Court found, the Voter ID Law itself actually increases the likelihood of delay at the polls. Since any minor discrepancy between a voter's photo identification card and the registration information may lead to a challenge, "the opportunities for presenting challenges ha[ve] increased as a result of the photo identification requirements." *Id.*, at 789; cf. 472 F. 3d, at 955 (Evans, J., dissenting) ("The potential for mischief with this law is obvious. Does the name on the ID 'conform' to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one—Schmit versus Schmitt—does it conform? If a 'Terence' appears on one and a shortened 'Terry' on the other, does it conform?").

B

The State's asserted interests in modernizing elections and combating fraud are decidedly modest; at best, they fail to offset the clear inference that thousands of Indiana citizens will be discouraged from voting. The two remaining justifications, meanwhile, actually weaken the State's case.

The lead opinion agrees with the State that "the inflation of its voter rolls is further support for its enactment of" the Voter ID Law. *Ante*, at 12. This is a puzzling conclusion, given the fact, which the lead opinion notes, that the National Government filed a complaint against Indiana, containing this allegation:

"Indiana has failed to conduct a general program that

makes a reasonable effort to identify and remove in-
eligible voters from the State's registration list; has
failed to remove such ineligible voters; and has failed
to engage in oversight actions sufficient to ensure that
local election jurisdictions identify and remove such
ineligible voters." App. 309, 312.

The Federal Government and the State agreed to settle
the case, and a consent decree and order have been en-
tered, see *ante*, at 12–13, requiring Indiana to fulfill its
list-maintenance obligations under §8 of the National
Voter Registration Act of 1993, 107 Stat. 82, 42 U. S. C.
§1973gg–6.

How any of this can justify restrictions on the right to
vote is difficult to say. The State is simply trying to take
advantage of its own wrong: if it is true that the State's
fear of in-person voter impersonation fraud arises from its
bloated voter checklist, the answer to the problem is in the
State's own hands. The claim that the State has an inter-
est in addressing a symptom of the problem (alleged im-
personation) rather than the problem itself (the negli-
gently maintained bloated rolls) is thus self-defeating; it
shows that the State has no justifiable need to burden the
right to vote as it does, and it suggests that the State is
not as serious about combating fraud as it claims to be.[34]

The State's final justification, its interest in safeguard-
ing voter confidence, similarly collapses. The problem
with claiming this interest lies in its connection to the
bloated voter rolls; the State has come up with nothing to
suggest that its citizens doubt the integrity of the State's

---

[34] The voting-rolls argument also suggests that it would not be so
difficult to detect in-person voter fraud after all. If it is true that
practitioners of fraud are most likely to vote in the name of registered
voters whom they know to have died or left the jurisdiction, then
Indiana could simply audit its voting records to examine whether, and
how often, in-person votes were cast using these invalid registrations.

electoral process, except its own failure to maintain its rolls. The answer to this problem is not to burden the right to vote, but to end the official negligence.

It should go without saying that none of this is to deny States' legitimate interest in safeguarding public confidence. The Court has, for example, recognized that fighting perceptions of political corruption stemming from large political contributions is a legitimate and substantial state interest, underlying not only campaign finance laws, but bribery and antigratuity statutes as well. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 390 (2000). But the force of the interest depends on the facts (or plausibility of the assumptions) said to justify invoking it. See *id.*, at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"). While we found in *Nixon* that "there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters," *id.*, at 395, there is plenty of reason to be doubtful here, both about the reality and the perception. It is simply not plausible to assume here, with no evidence of in-person voter impersonation fraud in a State, and very little of it nationwide, that a public perception of such fraud is nevertheless "inherent" in an election system providing severe criminal penalties for fraud and mandating signature checks at the polls. Cf. *id.*, at 390 ("[T]he perception of corruption [is] 'inherent in a regime of large individual financial contributions' to candidates for public office" (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 27 (1976) *(per curiam)*).

C

Without a shred of evidence that in-person voter impersonation is a problem in the State, much less a crisis,

Indiana has adopted one of the most restrictive photo identification requirements in the country. The State recognizes that tens of thousands of qualified voters lack the necessary federally issued or state-issued identification, but it insists on implementing the requirement immediately, without allowing a transition period for targeted efforts to distribute the required identification to individuals who need it. The State hardly even tries to explain its decision to force indigents or religious objectors to travel all the way to their county seats every time they wish to vote, and if there is any waning of confidence in the administration of elections it probably owes more to the State's violation of federal election law than to any imposters at the polling places. It is impossible to say, on this record, that the State's interest in adopting its signally inhibiting photo identification requirement has been shown to outweigh the serious burdens it imposes on the right to vote.

If more were needed to condemn this law, our own precedent would provide it, for the calculation revealed in the Indiana statute crosses a line when it targets the poor and the weak. Cf. *Anderson* v. *Celebrezze*, 460 U. S. 780, 793 (1983) ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status"). If the Court's decision in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), stands for anything, it is that being poor has nothing to do with being qualified to vote. *Harper* made clear that "[t]o introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." *Id.*, at 668. The State's requirements here, that people without cars travel to a motor vehicle registry and that the poor who fail to do that get to their county seats within 10 days of every election, likewise translate into unjustified economic

burdens uncomfortably close to the outright $1.50 fee we struck down 42 years ago. Like that fee, the onus of the Indiana law is illegitimate just because it correlates with no state interest so well as it does with the object of deterring poorer residents from exercising the franchise.

\*    \*    \*

The Indiana Voter ID Law is thus unconstitutional: the state interests fail to justify the practical limitations placed on the right to vote, and the law imposes an unreasonable and irrelevant burden on voters who are poor and old. I would vacate the judgment of the Seventh Circuit, and remand for further proceedings.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 07–21 and 07–25

————

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                    *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                    *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE BREYER, dissenting.

Indiana's statute requires registered voters to present photo identification at the polls. It imposes a burden upon some voters, but it does so in order to prevent fraud, to build confidence in the voting system, and thereby to maintain the integrity of the voting process. In determining whether this statute violates the Federal Constitution, I would balance the voting-related interests that the statute affects, asking "whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative)." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring); *ante,* at 6–7 (lead opinion) (similar standard); *ante*, at 2–3 (SOUTER, J., dissenting) (similar standard). Applying this standard, I believe the statute is unconstitutional because it imposes a disproportionate burden upon

those eligible voters who lack a driver's license or other statutorily valid form of photo ID.

Like JUSTICE STEVENS, I give weight to the fact that a national commission, chaired by former President Jimmy Carter and former Secretary of State James Baker, studied the issue and recommended that States should require voter photo IDs. See Report of the Commission on Federal Election Reform, Building Confidence in U. S. Elections §2.5 (Sept. 2005) (Carter-Baker Report), App. 136–144. Because the record does not discredit the Carter-Baker Report or suggest that Indiana is exceptional, I see nothing to prevent Indiana's Legislature (or a federal court considering the constitutionality of the statute) from taking account of the legislatively relevant facts the report sets forth and paying attention to its expert conclusions. Thus, I share the general view of the lead opinion insofar as it holds that the Constitution does not *automatically* forbid Indiana from enacting a photo ID requirement. Were I also to believe, as JUSTICE STEVENS believes, that the burden imposed by the Indiana statute on eligible voters who lack photo IDs is indeterminate "on the basis of the record that has been made in this litigation," *ante*, at 18, or were I to believe, as JUSTICE SCALIA believes, that the burden the statute imposes is "minimal" or "justified," *ante*, at 1 (opinion concurring in judgment), then I too would reject the petitioners' facial attack, primarily for the reasons set forth in Part II of the lead opinion, see *ante*, at 7–13.

I cannot agree, however, with JUSTICE STEVENS' or JUSTICE SCALIA's assessment of the burdens imposed by the statute. The Carter-Baker Commission *conditioned* its recommendation upon the States' willingness to ensure that the requisite photo IDs "be easily available and issued free of charge" and that the requirement be "phased in" over two federal election cycles, to ease the transition. Carter-Baker Report, at App. 139, 140. And as described

in Part II of JUSTICE SOUTER's dissenting opinion, see *ante*, at 3–16, Indiana's law fails to satisfy these aspects of the Commission's recommendation.

For one thing, an Indiana nondriver, most likely to be poor, elderly, or disabled, will find it difficult and expensive to travel to the Bureau of Motor Vehicles, particularly if he or she resides in one of the many Indiana counties lacking a public transportation system. See *ante,* at 6–7 (SOUTER, J., dissenting) (noting that out of Indiana's 92 counties, 21 have no public transportation system at all and 32 others restrict public transportation to regional county service). For another, many of these individuals may be uncertain about how to obtain the underlying documentation, usually a passport or a birth certificate, upon which the statute insists. And some may find the costs associated with these documents unduly burdensome (up to $12 for a copy of a birth certificate; up to $100 for a passport). By way of comparison, this Court previously found unconstitutionally burdensome a poll tax of $1.50 (less than $10 today, inflation-adjusted). See *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 664 n. 1, 666 (1966); *ante*, at 30 (SOUTER, J., dissenting). Further, Indiana's exception for voters who cannot afford this cost imposes its own burden: a postelection trip to the county clerk or county election board to sign an indigency affidavit *after each election.* See *ante*, at 8–10 (same).

By way of contrast, two other States—Florida and Georgia—have put into practice photo ID requirements significantly less restrictive than Indiana's. Under the Florida law, the range of permissible forms of photo ID is substantially greater than in Indiana. See Fla. Stat. §101.043(1) (West Supp. 2008) (including employee badge or ID, a debit or credit card, a student ID, a retirement center ID, a neighborhood association ID, and a public assistance ID). Moreover, a Florida voter who lacks photo ID may cast a provisional ballot at the polling place that will be

counted if the State determines that his signature matches the one on his voter registration form. §§101.043(2); 101.048(2)(b).

Georgia restricts voters to a more limited list of acceptable photo IDs than does Florida, but accepts in addition to proof of voter registration a broader range of underlying documentation than does Indiana. See Ga. Code Ann. §21–2–417 (Supp. 2007); Ga. Comp. Rules & Regs., Rule 183–1–20.01 (2008) (permissible underlying documents include a paycheck stub, Social Security, Medicare, or Medicaid statement, school transcript, or federal affidavit of birth, as long as the document includes the voter's full name and date of birth). Moreover, a Federal District Court found that Georgia "has undertaken a serious, concerted effort to notify voters who may lack Photo ID cards of the Photo ID requirement, to inform those voters of the availability of free [State-issued] Photo ID cards or free Voter ID cards, to instruct the voters concerning how to obtain the cards, and to advise the voters that they can vote absentee by mail without a Photo ID." *Common Cause/Georgia* v. *Billups*, 504 F. Supp. 2d 1333, 1380 (ND Ga. 2007). While Indiana allows only certain groups such as the elderly and disabled to vote by absentee ballot, in Georgia *any* voter may vote absentee without providing any excuse, and (except where required by federal law) need not present a photo ID in order to do so. Compare Ind. Code §3–11–4–1 (West 2006) with Ga. Code Ann. §21–2–381 (Supp. 2007). Finally, neither Georgia nor Florida insists, as Indiana does, that indigent voters travel each election cycle to potentially distant places for the purposes of signing an indigency affidavit.

The record nowhere provides a convincing reason why Indiana's photo ID requirement must impose greater burdens than those of other States, or than the Carter-Baker Commission recommended nationwide. Nor is there any reason to think that there are proportionately

fewer such voters in Indiana than elsewhere in the country (the District Court's rough estimate was 43,000). See 458 F. Supp. 2d 775, 807 (SD Ind. 2006). And I need not determine the constitutionality of Florida's or Georgia's requirements (matters not before us), in order to conclude that Indiana's requirement imposes a significantly harsher, unjustified burden.

Of course, the Carter-Baker Report is not the Constitution of the United States. But its findings are highly relevant to both legislative and judicial determinations of the reasonableness of a photo ID requirement; to the related necessity of assuring that all those eligible to vote possess the requisite IDs; and to the presence of alternative methods of assuring that possession, methods that are superior to those that Indiana's statute sets forth. The Commission's findings, taken together with the considerations set forth in Part II of JUSTICE STEVENS' opinion, and Part II of JUSTICE SOUTER's dissenting opinion, lead me to the conclusion that while the Constitution does not in general forbid Indiana from enacting a photo ID requirement, this statute imposes a disproportionate burden upon those without valid photo IDs. For these reasons, I dissent.